# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:15CR321 |
| vs. | FINDINGS AND RECOMMENDATION |
| JOSE ALBERTO HERNANDEZ-ORTIZ, | |
| Defendant. | |

This matter is before the court on the Motion to Suppress (Filing No. 58) filed by defendant Jose Alberto Hernandez-Ortiz (Hernandez-Ortiz). Hernandez-Ortiz is charged in the Indictment along with co-defendants Martin Tirado-Bojorquez, and Saray Del Socorro-Vargas with a conspiracy to distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846. **See** Filing No. 44. All the defendants are also named in a Forfeiture Allegation regarding any proceeds of the conspiracy. *Id.* Hernandez-Ortiz seeks to suppress evidence seized during a search of a gold Oldsmobile Alero and Hernandez-Ortiz's residence located at 3302 Madison Street, Omaha, Nebraska, on August 20, 2015, and statements Hernandez-Ortiz made to law enforcement officers after his arrest on August 20, 2015.

The court held a hearing on the motion on January 26, 2016. Hernandez-Ortiz was present with his counsel, Andrew J. Wilson. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. Laurie Garcia-Hein served as a Spanish language interpreter. The court heard the testimony of Homeland Security Investigations (HSI) Special Agents Zach Wimer (Agent Wimer) and Doug Reisz (Agent Reisz). The court received into evidence the following exhibits: two Search and Seizure Warrant returns (Exhibits A and B); Application for a Search Warrant (Exhibit C); Rights Advisement in Spanish (Exhibit D); and an English translation of Exhibit D (Exhibit D1). A transcript (TR.) of the hearing was prepared and filed on February 1, 2016 (Filing No. 80).

## FINDINGS OF FACT

Agents Wimer, Reisz, and others have been conducting a greater than two-year investigation into a large scale narcotics organization operating in Mexico with a strong cell in the Omaha area (TR. 6-7, 32). The ongoing investigation, involving numerous informants, arrestees, officers, and surveillance, revealed narcotics shipments arriving from Mexico through California and Arizona into Omaha and currency returned to Mexico, usually through Phoenix, Arizona (TR. 6-7, 32). On August 20, 2015, the investigation focused on a house located at 7639 South 41st Street in Bellevue, Nebraska (TR. 7). For about one and one-half months prior to that date, officers observed several vehicles drive into the garage, stay for thirty to sixty minutes, then leave (TR. 8). For these reasons, the officers suspected the Bellevue residence was a "stash house" where narcotics were transferred from incoming vehicles and redistributed to others, while currency was collected and re-routed (TR. 7-8). Tirado-Bojorquez resided at the residence and was there on August 20, 2015 (TR. 8, 10).

At approximately 12:36 p.m., on August 20, 2015, Del Socorro-Vargas drove her vehicle to the Bellevue residence, drove directly into the garage, remained for thirty to forty-five minutes, and drove away (TR. 9-10). Officers followed Del Socorro-Vargas and, ultimately, conducted a traffic stop (TR. 10). Del Socorro-Vargas consented to a search of her vehicle, wherein officers discovered $162,000 in U.S. currency concealed in an after-market compartment in the vehicle's rear bumper (TR. 10).

Officers maintained surveillance on Tirado-Bojorquez who drove his vehicle away from the Bellevue residence (TR. 11). Officers easily tracked Tirado-Bojorquez's vehicle which was equipped with a court-authorized tracking device (TR. 11). Officers conducted a traffic stop of Tirado-Bojorquez's vehicle (TR. 11). The officers located $10,000 in U.S. currency concealed in a fruit snack container during a search of Tirado-Bojorquez's vehicle (TR. 12). The officers located an additional $25,000 in U.S. currency and materials used to wrap currency and narcotics in the Bellevue residence (TR. 12-13). At approximately 4:00 p.m., Tirado-Bojorquez provided information to the officers about a member of the organization named "Jose Ortiz" who was responsible for narcotics distribution in Omaha (TR. 12-13). Tirado-Bojorquez explained Jose Ortiz would collect narcotics sales proceeds and return them to Tirado-Bojorquez, who would

place them in vehicles returning west (TR. 13). Tirado-Bojorquez said he thought Jose Ortiz still had five pounds of methamphetamine at his house, the location of which Tirado-Bojorquez did not know (TR. 14). Tirado-Bojorquez did provide Jose Ortiz's cellular telephone number and a description of his vehicle, a gold Oldsmobile Alero, to the officers (TR. 15).

The officers' investigation partially confirmed Tirado-Bojorquez's information. The officers had previously observed the gold Oldsmobile Alero at the Bellevue residence and had its license plate number (TR. 15). The officers later worked with a cellular telephone provider to obtain tracking information about the cellular telephone number (TR. 15-17). The officers tracked the cellular telephone to a residence at 3302 Madison Street, Omaha, Nebraska (TR. 17). The officers set up surveillance and observed a gold Oldsmobile Alero parked in the open garage (TR. 17). Within forty-five minutes the officers watched a man leave the residence in the gold Oldsmobile Alero (TR. 17-18). Agent Wimer followed the gold Oldsmobile Alero to a shopping plaza where the man exited the vehicle and entered a store that sold cellular telephones (TR. 18).

At approximately 6:00 p.m., on August 20, 2015, Agent Wimer observed Hernandez-Ortiz exit a cellular telephone store with a bag containing a new cellular telephone (TR. 7, 18, 22). As Hernandez-Ortiz returned to the gold Oldsmobile Alero, Agent Wimer approached (TR. 19). Agent Wimer, wearing jeans and a t-shirt with his HSI chain badge exposed, spoke to Hernandez-Ortiz using limited Spanish by asking if he "had any papers" (TR. 19, 26). Hernandez-Ortiz responded, "no" (TR. 20). Agent Wimer placed Hernandez-Ortiz in handcuffs and moved him to an unmarked police vehicle in the back parking lot of the shopping plaza (TR. 20-21).

Agent Reisz arrived to speak to Hernandez-Ortiz in Spanish (TR. 34). Agent Reisz approached Hernandez-Ortiz who was seated in the passenger seat of an unmarked Nebraska State Patrol (NSP) truck (TR. 40). An NSP officer sat in the driver's seat and took notes during the interview as Agent Reisz translated the conversation from Spanish to English (TR. 40-41). Agent Reisz introduced himself to Hernandez-Ortiz and explained he was an HSI agent who arrived because the other officers were having difficulty communicating with Hernandez-Ortiz and there may be an

3

issue with his immigration status (TR. 34-35). Hernandez-Ortiz stated he understood the officers wanted to ask him some questions and he said, "yes" he was willing to answer some questions (TR. 35). Agent Reisz presented a rights advisory form to Hernandez-Ortiz and watched Hernandez-Ortiz initial each one as he read them (TR. 35-37, 42-43; Exhibit D). Agent Reisz interviewed Hernandez-Ortiz for five to ten minutes until Hernandez-Ortiz stated he did not want to answer any more questions (TR. 37).

## LEGAL ANALYSIS

Hernandez-Ortiz seeks to suppress evidence seized during the searches of his vehicle and residence and any statements he made after his arrest on August 20, 2015. Hernandez-Ortiz argues officers conducted his initial warrantless detention without reasonable suspicion and his arrest without probable cause. **See** Filing No. 58 - Motion. Hernandez-Ortiz further argues the statements he made to officers were fruits of his unlawful detention and arrest. *Id.* Finally, Hernandez-Ortiz contends the search warrants issued for his vehicle and residence were invalid as lacking sufficient factual basis to demonstrate probable cause to believe evidence of a crime would be located there. *Id.*

### A. Initial Detention and Arrest

"Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." ***United States v. Griffith***, 533 F.3d 979, 983 (8th Cir. 2008). When evaluating "each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing" the court "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" ***United States v. Arvizu***, 534 U.S. 266, 273-74 (2002) (**quoting *United States v. Cortez***, 449 U.S. 411, 417-18 (1981)); **see also *United States v. Stewart***, 631 F.3d 453, 457 (8th Cir. 2011). The court gives law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." ***United States v.***

*Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). This is because "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005). Accordingly, "[w]hether [the officers'] suspicions are reasonable is assessed from the point of view of trained law enforcement officers based on the totality of the circumstances known to the officers at the relevant time." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012). Moreover, the circumstances known to one officer may be imputed to other officers if they are working together on an investigation and "some degree of communication exists between them." *United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011). Under these circumstances, the officers' "collective knowledge" forms the basis of the acting officer's reasonable suspicion or probable cause. *Id.* at 703-04. An officer may become a member of an investigation team when he is instructed to conduct a traffic stop even if he does not possess "all the relevant collective knowledge of the team." *Id.* at 704; **see also** *United States v. Maltais*, 403 F.3d 550, 555 (8th Cir. 2005).

The government has the burden to prove justification existed for any restraint on the defendant. **See** *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004). One type of encounter between the police and a citizen is an investigative detention, which is a seizure of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity. **See, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Williams v. Decker*, 767 F.3d 734, 739 (8th Cir. 2014). "An officer is allowed to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007) (**citing** *Terry*, 392 U.S. at 30). "In making reasonable-suspicion determinations, reviewing courts must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Martinez-Cortes*, 566 F.3d 767, 769 (8th Cir. 2009) (internal quotation and citation omitted). "Reasonable suspicion must be supported by

'specific and articulable facts.'" ***United States v. Hughes***, 517 F.3d 1013, 1016 (8th Cir. 2008) (*citing Terry*, 392 U.S. at 21). "Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wrongdoing by a preponderance of the evidence." ***Williams***, 767 F.3d at 739. "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed in its totality." ***United States v. Morgan***, 270 F.3d 625, 631 (8th Cir. 2001); see also ***United States v. Gannon***, 531 F.3d 657, 661 (8th Cir. 2008). Information from confidential informants and surveillance related to controlled buys, even tangentially related to a suspect, may justify an investigatory stop. See ***United States v. Briley***, 319 F.3d at 364 (8th Cir. 2003) (finding probable cause for investigatory stop where confidential informant supplied information of suspect's drug distribution); ***United States v. Hughes***, 15 F.3d 798, 801-02 (8th Cir. 1994) (concluding a prior controlled buy, confidential informant's identification of suspect's vehicle, and confidential informant's statement that suspect possessed crack cocaine justified investigatory stop of suspect's vehicle).

"There is no clear line between investigative stops and de facto arrests." ***United States v. Sanford***, No. 15-1501, 2016 WL 612070, at *3 (8th Cir. Feb. 16, 2016) (slip op.). "Probable cause for an arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." ***United States v. Roberts***, 787 F.3d 1204, 1210 (8th Cir. 2015) (internal quotation and citation omitted). "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." ***Winarske***, 715 F.3d at 1067. "A probability or substantial chance of criminal activity, rather than an actual showing of criminal activity is sufficient." ***United States v. Smith***, 715 F.3d 1110, 1115 (8th Cir. 2013).

The officers were part of an ongoing narcotics investigation, which combined with their observations of unusual traffic patterns at the Bellevue residence over the course of more than one month, led them to reasonably believe the residence was a stash house. The observations included witnessing (1) Del Socorro-Vargas' vehicle arrive, park in the garage for thirty to forty-five minutes and leave, after which the vehicle was

6

found to conceal a large amount of U.S. currency, and (2) a distinctive gold Oldsmobile Alero conforming to the unusual traffic pattern. Additionally, the officers learned from Tirado-Bojorquez, who resided in the Bellevue residence, that a man named Ortiz, who drove a gold Oldsmobile Alero, was involved in the narcotics activities and had a specific amount of methamphetamine based on a conversation between Tirado-Bojorquez and Ortiz that day. Tirado-Bojorquez provided Ortiz's cellular telephone number which the officers traced to a residence with a gold Oldsmobile Alero parked in the garage; the same gold Oldsmobile Alero previously seen at the Bellevue residence. After successfully tracing the cellular telephone, the officers followed the Alero to a store where Hernandez-Ortiz could purchase a cellular telephone. These events show that not only did the officers have reasonable suspicion to stop and detain Hernandez-Ortiz, the officers possessed sufficient probable cause to arrest him. Accordingly, Hernandez-Ortiz's motion to suppress evidence based on an unlawful detention or arrest should be denied.

**B.    Statements**

The exclusionary rule prohibits the admission of evidence unconstitutionally obtained. *Weeks v. United States*, 232 U.S. 383 (1914). The rule also applies to evidence, tangible and testimonial, which was derived, directly or indirectly, from the unconstitutionally obtained evidence, i.e., the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487 (1963); *Nardone v. United States*, 308 U.S. 338 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920). Having found Hernandez-Ortiz's detention and arrest were constitutionally permissible, the court finds Hernandez-Ortiz's statements were not tainted by any "poisonous tree" as claimed by Hernandez-Ortiz under *Wong Sun*. Hernandez-Ortiz does not assert any other constitutionally infirm conduct rendered his statements involuntary. Similarly, no evidence suggests Hernandez-Ortiz made any involuntary statements. For the reasons stated above, Hernandez-Ortiz's motion to suppress his statements should be denied.

**C.     Search Warrants**

An affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects, and place. 2 Wayne R. LaFave, Search & Seizure § 3.7(d) at 412 (4th ed. 2004). When reviewing the sufficiency of an affidavit "[a] totality of the circumstances test is used to determine whether probable cause exists. Courts should apply a common sense approach and, considering all relevant circumstances, determine whether probable cause exists." ***United States v. Hager***, 710 F.3d 830, 836 (8th Cir. 2013) (noting "judges may draw reasonable inferences" from the relevant circumstances); **see** ***United States v. O'Dell***, 766 F.3d 870, 873 (8th Cir. 2014). "Probable cause is established when there is a fair probability that the object of the search warrant may be found in the place to be searched." ***United States v. Romo-Corrales***, 592 F.3d 915, 919 (8th Cir. 2010) (internal quotation omitted). When relying on an affidavit to establish probable cause, "the probable cause determination must be based upon only that information which is found within the four corners of the affidavit." ***United States v. Stults***, 575 F.3d 834, 843 (8th Cir. 2009).

The court has carefully reviewed the application for the search warrants for Hernandez-Ortiz's vehicle and residence. **See** Exhibit C. The application provides essentially the same information contained in this court's factual findings. The information contained in the affidavit provided sufficient probable cause to issue the warrants to search the vehicle and residence. Specifically, the officers had information Hernandez-Ortiz, in his vehicle, had visited Tirado-Bojorquez at the stash house earlier in the day and Hernandez-Ortiz still had at least five pounds of methamphetamine at his residence. The officers located Hernandez-Ortiz and the residence within hours and observed Hernandez-Ortiz with the vehicle at the residence. The officers relied on information provided by a named suspected co-conspirator and did not rely on a confidential informant. Nevertheless, the officers corroborated the information they had gathered throughout their investigation with that provided by Tirado-Bojorquez. Accordingly, the information contained in the application suggested a fair probability that contraband or evidence of a crime would be found in either Hernandez-Ortiz's vehicle or residence, or both. Therefore,

**IT IS RECOMMENDED TO CHIEF JUDGE LAURIE SMITH CAMP that**:

Jose Alberto Hernandez-Ortiz Motion to Suppress (Filing No. 58) be denied.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Order and Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Order and Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 8th day of March, 2016.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge